## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON  DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | Case No. 1:14CR00023 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **BETH PALIN, ET AL.,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Janine M. Myatt, Special Assistant United States Attorney, Abingdon, Virginia, for United States; Michael J. Khouri, Khouri Law Firm, Irvine, California, for Defendant Beth Palin; Nancy C. Dickenson, Assistant Federal Public Defender, Abingdon, Virginia, for Defendant Joseph D. Webb; Edward G. Stout, Curcio & Stout, Bristol, Virginia, for Defendant Mary Elizabeth Curtiss.*

In this criminal case, in which the defendants are accused of health care fraud and related offenses, the defendants have moved to dismiss the indictment on several grounds.  Because I find that the indictment is sufficiently specific and there is no reason to overturn the grand jury's charging decision, I will deny the defendants' motion to dismiss.

### I.

The indictment in this case charges the defendants with participating in a conspiracy to defraud Medicare, TennCare,[1] and Virginia Medicaid by ordering and billing for unnecessary urine drug screen tests in violation of 18 U.S.C. § 1347, and paying and receiving illegal remunerations in violation of 42 U.S.C. §

---

[1] TennCare is the name of the Tennessee Medicaid program.

1320a-7b(b)(1)(A) and (b)(2)(A).  After obtaining discovery from the government, defendant Palin moved to dismiss the indictment.  Defendants Webb and Curtiss each moved to join Palin's motion to dismiss.[2]  Palin then filed a supplemental motion to dismiss, in which Webb and Curtiss did not join.  The motions to dismiss have been fully briefed and orally argued.

The indictment's key allegations are as follows.[3]  Bristol Laboratories, LLC ("Bristol Labs") was owned and operated by codefendants Palin and Webb, who are husband and wife.[4]  Bristol Labs was a participating provider for Medicare, TennCare, and Virginia Medicaid, as well as for a number of private insurance companies.

---

[2]  Webb moved to join Palin's motion to dismiss in its entirety.  (ECF No. 154.) Dr. Curtiss moved to join the motion to dismiss only as to certain issues.  (ECF No. 156.) Specifically, Dr. Curtiss moved to join the following portions of the motion to dismiss: the introduction; the contention that the delay between the government's investigation and issuance of the indictment warrants dismissal; the assertion that the government misled the grand jury as to certain facts and the law; the argument that Dr. Curtiss's salary is not illegal remuneration and is within the safe harbor for personal services contracts; the argument that the government has failed to establish through expert testimony that the salary paid to Dr. Curtiss exceeded the fair market value of her legitimate services; and the argument that it is not unlawful to charge different fees for different tests.  I will grant the motions of Webb and Curtiss to join in Palin's motion to dismiss.

[3]  Of course, the defendants have pleaded not guilty and deny they committed the crimes as charged.  The facts of the indictment are simply allegations and not proof of guilt.

[4]  The indictment alleges that Webb, "although not an owner according to corporate filings, is heavily involved in running the business.  WEBB handles the marketing part of the business and is also involved with hiring and firing employees." (Indictment ¶ 28, ECF No. 4.)

In 2009, an anesthesiologist named Charles K. Wagner, M.D., obtained what is known as an X number from the federal Drug Enforcement Agency that allowed him to prescribe the drugs Subutex, Suboxone, and buprenorphine for treatment of drug addiction. Dr. Wagner opened a practice in Bristol, Virginia, in the summer of 2009 and ultimately closed the practice in April 2012. Dr. Wagner died on March 14, 2013, more than a year before the indictment in this case.

Dr. Wagner accepted only cash payments from his patients; he did not accept Medicare, Medicaid, or private insurance. However, he collected patients' insurance information and submitted preauthorization forms so insured patients could obtain benefits for prescriptions that were covered by their plans. Patients visited Dr. Wagner's medical practice each week to obtain prescriptions for one week's worth of Subutex, Suboxone, or buprenorphine. Dr. Wagner required all of his patients to undergo a urine drug screen at every weekly appointment. All of the urine samples were sent to Bristol Labs for processing. Bristol Labs billed Medicare, TennCare, Virginia Medicaid, and private insurance for tests performed on the urine samples.

Mary Elizabeth Curtiss, M.D., is an otolaryngologist, more commonly known as an ear, nose, and throat doctor. Like Dr. Wagner, Dr. Curtiss obtained an X number that allowed her to prescribe Suboxone, Subutex, and buprenorphine

for treatment of drug addiction.    Dr. Curtiss worked for Dr. Wagner for approximately three months in the summer of 2010.

In December 2010, Palin and Webb opened an office-based addiction treatment clinic in Gate City, Virginia, called Mountain Empire Medical Care, LLC ("MEMC").    Palin and Webb entered into a contract with Dr. Curtiss to provide physician services at MEMC.    Under her contract, Dr. Curtiss was paid $1400 for each day she worked at MEMC, regardless of how many patients she saw.

Like Dr. Wagner, Dr. Curtiss did not accept insurance, but MEMC collected patient insurance information and submitted preauthorization forms to Bristol Labs.  Also like Dr. Wagner, Dr. Curtiss required every patient to take a urine drug screen in order to obtain a weekly prescription for Suboxone, Subutex, or buprenorphine.  Every urine sample was sent to Bristol Labs for testing.

Both Dr. Wagner and Dr. Curtiss ordered insured patients to undergo two different kinds of automated drug screens:  a qualitative test that detected the presence or absence of a drug or its metabolites, and a quantitative test that measured how much of a drug or its metabolites were present in the patient's urine. Uninsured patients, on the other hand, were only required to take a cheaper, dip-stick type of drug screen called a quick cup test.  The quick cup test detected the presence of a drug or its metabolites, but it did not measure the quantity in the

patient's urine.  The tests given to insured patients were many times more expensive than the quick cup test, which cost only $25.  Bristol Labs performed the qualitative testing on the insured patients' samples in-house and then sent the specimens to a lab in Denver, Colorado, for quantitative testing.

Uninsured patients did not receive any of the automated testing that insured patients received.  Uninsured patients were not given the option of these more sophisticated, expensive tests, and insured patients were not given the option of the cheaper quick cup tests.[5]  The type of drug screen ordered depended only on the patient's insurance status and was unrelated to the patient's individual treatment. The results of the drug screens were not used to alter the patients' treatment plans. In other words, if a drug screen showed that a patient was abusing other drugs or was not taking the drug prescribed for addiction treatment, the doctor would not change the patient's prescription, require the patient to attend addiction counseling, or dismiss the patient from treatment.

Until December 2010, Dr. Wagner's office was located in the same building as Bristol Labs.  Patients and staff freely moved back and forth between the doctor's office and the lab.  In January 2011, Dr. Wagner's office moved to a different location that was not physically close to Bristol Labs.  Bristol Labs placed

---

5.  At least initially, Dr. Curtiss required insured patients to undergo both quick cup testing and automated testing, while uninsured patients were only required to submit to quick cup testing.

a staff person at Dr. Wagner's new office every day the doctor's office was open for business. This Bristol Labs employee would collect insurance information from insured patients or cash from uninsured patients, along with the patients' urine specimens. The Bristol Labs employee would then take the specimens collected to the lab for processing and analysis.

Palin and Webb eventually decided to hire additional physicians to work at MEMC, as Dr. Curtiss only worked at MEMC one to two days per week. They hired one additional physician who already had an X number; that physician, who is not named in the indictment, started working at MEMC in the summer of 2011 and treated four patients. Palin and Webb sought to hire two other physicians who did not have X numbers, and thus could not legally prescribe Subutex, Suboxone, or buprenorphine. These two physicians took an online course at Bristol Labs in order to obtain their X numbers, and Bristol Labs paid for the course. These physicians never commenced working for MEMC because MEMC ceased operations shortly after the physicians took the online course.

Bristol Labs created the drug screen order forms that the MEMC doctors used to order drug screens. The doctors pre-signed the order forms. A Bristol Labs employee stationed at MEMC would check off the tests to be performed depending on whether the patient was insured.

The government alleges that Palin and Webb required Dr. Curtiss and the other MEMC physician to order excessive, medically unnecessary drug screens and to send the samples to Bristol Labs for processing and analysis. The patients' ability to obtain prescriptions for Subutex, Suboxone, and buprenorphine was conditioned upon submitting to the weekly drug screens, and the defendants treated insured patients differently than uninsured patients. Dr. Curtiss, the other unnamed MEMC physician, and Dr. Wagner ordered the unnecessary drug screens, and Palin and Webb billed Medicare, TennCare, and Virginia Medicaid for the unnecessary tests, thereby allegedly defrauding these government insurance programs. According to the government, the amount Dr. Curtiss was paid by MEMC exceeded the fair market value of her legitimate services and was not economically viable without considering the value of her referrals to Bristol Labs. Therefore, the government contends that Palin and Webb paid, and Dr. Curtiss received, unlawful remunerations in return for referring individuals to Bristol Labs for urine drug screens.

The defendants have moved to dismiss the indictment on several grounds. First, they argue that the government unreasonably delayed in charging the defendants in this case, and that the delay has prejudiced the defendants due to the pre-indictment death of Dr. Wagner. Three years elapsed from the time the government first began presenting evidence to the grand jury until the date on

which the indictment issued.  The defendants assert that they are prejudiced by this delay because Dr. Wagner's notes and other medical records cannot be interpreted and Dr. Wagner cannot be interviewed now that he is deceased.

Second, it is contended that the indictment is impermissibly vague and fails to allege any unlawful acts by Palin in particular.  Palin argues that because she is not a doctor, she had neither a duty nor the training to determine whether the urine drug screens ordered by Dr. Curtiss and the other physicians were medically necessary.  She contends that the indictment merely alleges that she performed the testing that was ordered by the physicians and billed the government health care programs for the testing that was performed.  Because these actions are not illegal in and of themselves, Palin argues that the indictment fails to allege that she committed any criminal act.

Third, the defendants claim that the indictment violates their Fifth Amendment right to due process of law because the government misinformed the grand jury of the law and facts.  The defendants argue that the government was obligated to inform the grand jury of a certain safe harbor exception to one of the crimes with which the defendants are charged.  The defendants contend that had the grand jury been aware of the safe harbor exception, it likely would not have voted to indict.  The defendants also contend that the government improperly

implied to the grand jury that it was unlawful for the defendants to bill different amounts for different kinds of urine drug screen tests.

Finally, the defendants argue that the indictment's charges are not supported by fact or law. This argument rests on the safe harbor provision which excludes certain personal services contracts from the definition of remuneration for purposes of the Anti-Kickback Statute. *See* 42 U.S.C. § 1320a-7b(b); 42 C.F.R. § 1001.952(d). The defendants argue that because the government has not identified an expert who can opine about the fair market value of the services provided by Dr. Curtiss, the government cannot prove that MEMC's payments to Dr. Curtiss exceeded fair market value and constituted unlawful remunerations.

I will address each of these arguments in turn.

## II.

First, the passage of approximately three years between the beginning of grand jury proceedings and the issuance of the indictment does not provide a basis for dismissing the indictment. In evaluating the defendants' claim that a preindictment delay violated their right to due process, I must initially determine whether the defendants have shown that the delay caused them actual prejudice. If the defendants meet that burden, I must then balance the government's reasons for the delay against the prejudice to the defendants, considering the fundamental concepts of fair play and justice. *See, e.g.*, *United States v. Lovasco*, 431 U.S. 783,

790 (1977); *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009); *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 403-04 (4th Cir. 1985).   The Supreme Court has held that in light of the statute of limitations, the possibilities "that memories will dim, witnesses become inaccessible, and evidence be lost," on their own, are not sufficient to warrant dismissal.   *United States v. Marion*, 404 U.S. 307, 325-26 (1971).

The defendants do not dispute that they were indicted within the five-year statute of limitations.   *See* 18 U.S.C. § 3282(a).   They have presented no evidence that the delayed indictment was the result of bad faith on the part of the government.   They argue that because Dr. Wagner died before they were indicted, the preindictment delay has prejudiced them by preventing them from interviewing Dr. Wagner or obtaining his interpretation of his notes and other medical records.

The defendants have not met their burden of demonstrating that Dr. Wagner's death caused them to suffer actual prejudice.   If Dr. Wagner were alive and a defendant in this case, he might invoke his right not to testify, preventing the defendants from relying on his testimony regarding his interpretation of medical records or notes.   Moreover, the government asserts that counsel for Palin and former counsel for Dr. Curtiss were informed in late 2011 — long before Dr. Wagner's death — that Palin and Dr. Curtiss were targets of the government's investigation.   The defendants have not disputed this assertion.   Presumably, then,

-10-

defense counsel had ample opportunity to interview Dr. Wagner prior to his death in March 2013.

The defendants contend that Dr. Wagner was the true target of the government's investigation and that the defendants were indicted only because Dr. Wagner is now deceased. I find that argument unpersuasive. Regardless of what Dr. Wagner may or may not have done, the indictment alleges sufficient actions by the defendants which, if true, could establish criminal liability on the part of the defendants. Because the defendants have not shown that the government's delay in securing an indictment resulted in actual prejudice to the defendants, or that the delay was unreasonable or in bad faith, the preindictment delay does not warrant dismissal.

The defendants' contention that the indictment is vague and legally insufficient is equally unpersuasive. The requirements for an indictment are not onerous. Rule 7 of the Federal Rules of Criminal Procedure states that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). To satisfy constitutional requirements, "[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (internal quotation

marks and citations omitted).  The Fourth Circuit has emphasized the first element, stating that an "indictment must include every essential element of an offense, or else the indictment is invalid." *Id.* (internal quotation marks and citations omitted). Otherwise, the indictment fails to provide the defendants sufficient notice of what crime they have committed.  *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (holding that due process requires fair notice of what constitutes an offense).

An explanation of the government's legal theory with supporting evidentiary facts "'is not and never has been required at the indictment stage.'"  *United States v. Loayza*, 107 F.3d 257, 261 (4th Cir. 1997) (quoting *United States v. Arlen*, 947 F.2d 139, 145 n. 7 (5th Cir. 1991)).   Rather, "[a]n indictment that tracks the statutory language is ordinarily sufficient to allege an offense."  *United States v. Davis*, No. 1:13-cr-00043-MR-DLH-1, 2013 WL 6499533, at *2 (W.D.N.C. Dec. 11, 2013) (citing *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999)). "Where an indictment fails to provide a defendant with sufficient information to prepare a defense, such deficiency may be remedied through discovery or by requiring the Government to file a bill of particulars."  *Id.* at *3.

Normally a defendant is precluded from obtaining a dismissal prior to trial on the ground that the evidence, once presented, will be insufficient as a matter of law to convince a reasonable jury to convict.  *See United States v. Hall*, 20 F.3d

1084, 1087 (10th Cir. 1994) ("Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion.")  Such a motion is available only where the government has stipulated to the evidence that it would present at trial as to one of the essential elements of a case.  *See United States v. Jones*, 117 F. Supp. 2d 551, 553 (W.D. Va. 2000) (considering a motion to dismiss only because the government stipulated to its complete evidence in chief).

I find that the indictment in this case is sufficiently specific.  The government alleges that the defendants conspired to commit health care fraud in violation of 18 U.S.C. § 1347, and that they paid and received illegal remunerations in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and (b)(2)(A).  The essential elements of a conspiracy are "1) an agreement between two or more persons, tacit or express, to undertake to violate [the statute]; 2) the accused willfully joined the conspiracy; 3) with intent to accomplish the criminal purpose of the conspiracy."  *United States v. Mills*, 995 F.2d 480, 483 (4th Cir. 1993).  The indictment adequately alleges these elements, tracks the statutory language of the offenses charged, and sets forth additional factual allegations.  The facts in this case are contested, and the government has not stipulated to the complete evidence it plans to present.  Until the government has presented its case in chief, it is impossible to know what evidence the government might offer to prove the

charges and whether that evidence will be sufficient.   It would, therefore, be inappropriate to determine the sufficiency of the evidence at this time.

The defendants also challenge the grand jury's charging decision based on the evidence and argument presented to the grand jury.  A defendant generally may not challenge an indictment on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.  *Costello v. United States*, 350 U.S. 359, 364 (1956).  However, the court has the discretion to dismiss an indictment on the basis of an error in the grand jury proceedings when the defendant shows he has been prejudiced by the irregularity.  *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254 (1988) (holding that, "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants"); *United States v. Patterson*, No. 99-4192, 2000 WL 19196, at *1 (4th Cir. Jan. 12, 2000) (unpublished).  The Supreme Court has held that a defendant is prejudiced only where "'the violation substantially influenced the grand jury's decision to indict'" or where "there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring)).

I have reviewed the portion of the transcript of the grand jury proceedings submitted by the defense, and I do not find that the government misled the jury as

-14-

to the facts or applicable law. The defendants argue that the government should have informed the grand jury of the safe harbor regulation that excludes certain personal services contracts from the definition of remuneration for purposes of 42 U.S.C. § 1320a-7b(b). *See* 42 C.F.R. § 1001.952(d). This safe harbor provision, however, is an affirmative defense. *See, e.g.*, *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (unpublished); *United States v. Barnes*, 2015 WL 5089547, at *5 (E.D. La. Aug. 27, 2015); *United States v. Davis*, Criminal Action No. H-14-171S-12, 2014 WL 6679199, at *5 (S.D. Tex. Nov. 25, 2014). The government was not required to anticipate the defendants' possible affirmative defenses and present them to the grand jury. *United States v. Williams*, 504 U.S. 36, 51 (1992) (noting that to require the "prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body"); *United States v. Gardner*, 860 F.2d 1391, 1395 (7th Cir. 1988).

I also find that the government did not imply to the grand jury that it is unlawful for a health care provider to bill different amounts for different tests. The grand jury heard evidence about the various kinds of urine drug screens that were ordered, processed, and billed by the defendants. The grand jury further heard evidence regarding which patients were given which tests. The grand jury apparently concluded that there was probable cause to believe that some of the

urine drug screens ordered and billed to the government health care programs were unnecessary, which would support the indictment's charge that the defendants committed health care fraud. The defendants have not shown that the information presented to the jury was inaccurate or misleading, nor have they shown that they were prejudiced by any irregularities in the grand jury proceedings.

Lastly, the defendants contend that the government's lack of an expert on the issue of the fair market value of Dr. Curtiss's services renders the government unable to meet its burden of proof. The problem with this argument is that the defendants, not the government, bear the burden of proving affirmative defenses. Whether MEMC's payments to Dr. Curtiss exceeded the fair market value of her services is not an element of any crime charged; rather, it is an element of an affirmative defense invoked by the defendants. *See* 42 C.F.R. § 1001.952(d); *United States ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 669 (W.D. Pa. 2014). Because the government is not required to prove that the payments to Dr. Curtiss exceeded the fair market value of her services, the lack of an expert witness on this issue is not a proper ground for dismissal.

### III.

For the foregoing reasons, it is **ORDERED** as follows:

1.  The Motions to Join (ECF Nos. 154 and 156) are GRANTED;

2.  The Motion to Dismiss (ECF No. 147), as joined by Webb and Dr.

Curtiss, is DENIED; and

3.  The Supplemental Motion to Dismiss (ECF No. 158) is DENIED.


ENTER:   October 16, 2015

/s/  James P. Jones
United States District Judge