# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | Case No. 1:14CR00023 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **BETH PALIN, ET AL.,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Janine M. Myatt, Special Assistant United States Attorney, and Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Michael J. Khouri, Khouri Law Firm, Irvine, California, for Defendant Beth Palin; Nancy C. Dickenson, Assistant Federal Public Defender, Abingdon, Virginia, for Defendant Joseph D. Webb; Edward G. Stout, Curcio & Stout, Bristol, Virginia, for Defendant Mary Elizabeth Curtiss.*

In this criminal case, in which the defendants are accused of health care fraud and paying and receiving kickbacks, the defendants waived their right to a jury trial and with the consent of the government, the case was tried before the court.  This opinion sets forth the findings of fact and conclusions of law supporting my verdicts.[1]

---

[1]  While no party has requested specific findings of fact, *see* Fed. R. Crim. P. 23(c), I nevertheless in my discretion find it appropriate to set forth such findings.

I.    BACKGROUND AND CHARGES.

The Indictment in this case charges the defendants with participating in a conspiracy between May 1, 2009, to April 30, 2012, to defraud Medicare, TennCare,[2] Virginia Medicaid, and private insurance companies by ordering, completing, and billing for medically unnecessary urine drug screens in violation of 18 U.S.C. § 1347, and paying and receiving illegal remunerations, or kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and (b)(2)(A).  The Indictment's key allegations are described in detail in my earlier opinion denying the defendants' Motion to Dismiss.  *United States v. Palin*, No. 1:14CR00023, 2015 WL 6134128, at *1-4 (W.D. Va. Oct. 16, 2015).  Count One charges all three defendants, as principals, aiders, and abetters, with health care fraud under 18 U.S.C. §§ 2, 1347.  Count Two charges all three defendants with conspiracy to commit health care fraud under 18 U.S.C. § 1349.  Count Three charges defendant Mary Elizabeth Curtiss, a physician, with receiving illegal remunerations under 42 U.S.C. § 1320a-7b(b)(1)(A), and Count Four charges defendants Beth Palin and Joseph D. Webb with paying illegal remunerations under 42 U.S.C. § 1320a-7b(b)(2)(A).

The nonjury trial began on Monday, February 1, 2016, and lasted approximately six and a half days.  The government called 36 witnesses and

---

[2]  TennCare is the name of the Tennessee Medicaid program.

introduced 161 exhibits.  On April 7, 2016, I reconvened the parties for the purpose of announcing my verdict in open court.

## II.    FINDINGS OF FACT.

The following are the court's findings of fact.  In determining the credibility of the witnesses, I have taken into account the rationality and internal consistency of the witnesses' testimony, the extent of detail and coherent nature of the testimony, the manner of testifying by the witnesses, and the degree to which the subject testimony is consistent or inconsistent with the other evidence in the case. Moreover, I have drawn such reasonable inferences from the credible direct and circumstantial evidence as is permitted by reason and common sense.

1.    Ownership of Bristol Laboratories, LLC ("Bristol Labs") was in Palin's name, but Webb, her husband, was directly involved in its operation.  The ostensible business of Bristol Labs was to conduct drug screens of patient urine samples ordered by physicians.  Most of the physicians who ordered urine drug screens from Bristol Labs were addiction medicine practitioners.

2.    Palin made the final business decisions for Bristol Labs.  Webb performed marketing tasks and served as a liaison between employees and Palin.

3.    Charles K. Wagner, M.D., was an addiction medicine practitioner who opened an office in 2009 next to Bristol Labs in Bristol, Virginia.  The Indictment

charges Dr. Wagner as a coconspirator, but he died before the Indictment was returned and is not a defendant.

4.     In his practice, Dr. Wagner prescribed Subutex (buprenorphine hydrochloride) and Suboxone (buprenorphine hydrochloride and naloxone hydrochloride) for treatment of opioid dependency.

5.     Buprenorphine hydrochloride ("buprenorphine") treats withdrawal from opioids by occupying receptors in the brain. A normal non-drug user's brain has relatively few of these receptors, and approximately 50-75% of the receptors are ordinarily occupied by endorphins produced by the human body. The brain of a person who is using opioids has many more receptors, and the receptors are occupied by those drugs. The full occupation of all of the receptors can cause the person to stop breathing, often resulting in death by overdose. Once a person has become physically dependent on opioids, the body cannot make enough endorphins to occupy the receptors. If the person stops taking the opiates or opioids, the receptors become unoccupied, causing the patient to experience physical withdrawal effects. When experiencing withdrawal, a person can suffer from flu-like symptoms, diarrhea, and other unpleasant effects. Buprenorphine occupies the receptors and stops or prevents the physical withdrawal symptoms without creating the kind of high caused by opioid use. As a patient's treatment

progresses, the goal is to eventually taper the use of buprenorphine and, ultimately, to wean the patient from buprenorphine entirely.

6.    The naloxone hydrochloride ("naloxone") contained in Suboxone is a reversal agent that prevents users from experiencing a high if they take the medication other than as prescribed. Because Subutex does not contain naloxone, it is more subject to diversion and abuse than Suboxone. Therefore, prescription of Subutex is generally appropriate only if the patient is pregnant or allergic to naloxone.

7.    Dr. Wagner required his patients to submit to weekly urine drug screens. The purpose of these tests was to make sure that the patients were taking the prescribed Suboxone or Subutex, rather than diverting it, and were not taking other commonly abused drugs.

8.    Initially, Dr. Wagner ordered that all of his patients' urine samples be tested at Bristol Labs on a machine called an analyzer. After about six months, Palin informed Dr. Wagner that Bristol Labs would no longer test uninsured patients' samples on the analyzer because Bristol Labs was not likely to receive payment for those tests.

9.    Bristol Labs began administering so-called "quick-cup" urine tests to self-pay patients, for which the patients were required to pay $25 in cash at the time of the test. The quick-cup consisted of a plastic cup with a built-in indicator

that, when the cup was filled with urine, immediately showed whether the patient's urine contained metabolites of certain drugs. The quick-cup test was a qualitative test that showed only the presence or absence of a drug in the urine. The quick-cup test did not indicate the quantity of a substance in the urine; in other words, it was not a quantitative test.

10.     Dr. Wagner's patients would go to Bristol Labs with an order form for a urine drug screen, go into the bathroom and pass urine into a cup, and give it to a Bristol Labs employee. If the patient had health insurance, the Bristol Labs employee would test the sample on the analyzer machine. If the patient did not have health insurance, the patient would be required to pay $25, and the patient's sample would be subjected to the quick-cup test.

11.     Dr. Wagner's patients could write on the order form any prescription medications they were taking. Many of the patients wrote that they were taking benzodiazepines, which could interact dangerously with the Suboxone or Subutex that Dr. Wagner was prescribing to them.

12.     Bristol Labs used the analyzer to test the samples of insured patients for 15 drugs of abuse.

13.     Bristol Labs then sent the remainder of the insured patient's urine sample to Forensic Laboratories ("Forensic Labs"), a high complexity laboratory located in Denver, Colorado, for confirmation testing. The testing done at Forensic

Labs was more sophisticated than the testing performed by Bristol Labs. Both tests were quantitative tests, but the Forensic Labs test employed a different methodology.

14.    The confirmation testing by Forensic Labs was done regardless of whether the results obtained at Bristol Labs were positive or negative for any banned substances. If the initial Bristol Labs analyzer test was positive for a substance, and the insured patient admitted to having taken that substance, the sample was still sent for confirmation testing, even though the patient did not dispute the results of the analyzer test.

15.    Patients were expected to test positive for buprenorphine, the active ingredient in Suboxone and Subutex, which had been prescribed to them for their addiction treatment. Even when the analyzer test was positive for buprenorphine, the insured patient's sample was still sent to Forensic Labs for confirmation testing.

16.    Bristol Labs would send the patient's remaining urine sample to Forensic Labs by overnight delivery.

17.    The defendants in this case were not affiliated in any way with Forensic Labs and did not receive any payment for tests performed by Forensic Labs.

18.    Forensic Labs billed patients' insurers directly for the confirmation testing.  Bristol Labs did not bill insurers for tests performed at Forensic Labs.

19.    Bristol Labs was a moderate complexity clinical testing laboratory and could not perform the kind of confirmation testing done by Forensic Labs.[3] Bristol Labs eventually purchased a machine that would allow it to qualify as a high complexity laboratory and to perform its own confirmation testing.  However, it never began doing its own confirmation testing because it lost most of its business after the execution of a federal search warrant, before it had obtained a high complexity certification.

20.    Dr. Wagner's referral of urine drug tests was the top source of income for Bristol Labs.

21.    Dr. Wagner eventually moved to Louisiana.  There was a period of time during which he was not living in the Bristol area but his practice was still open and operating.  During that time, he initially came to the practice weekly, but he visited less and less as time went on.  Dr. Wagner eventually moved his Bristol, Virginia, practice to a different location in adjacent Bristol, Tennessee, not in the immediate vicinity of Bristol Labs.  Dr. Wagner's practice ultimately closed, and he is now deceased.

---

[3] Laboratory tests are categorized as waived, moderate complexity, or high complexity.  42 C.F.R. § 493.5.  The categories and certificate application process are explained at 42 C.F.R. §§ 493.17, 493.20, 493.25, 493.43, and 493.45.

22.    Palin and Webb were interested in purchasing Dr. Wagner's practice, but he decided not to sell it.

23.    Palin and Webb then decided to establish a medical practice to generate business for Bristol Labs.  Initially, Palin and Webb opened an addiction treatment clinic called MedPath, which was located in Bristol, Virginia, but it was short-lived due to licensing or permitting issues.  Shortly thereafter, Palin and Webb founded Mtn. Empire Medical Care LLC ("MEMC"), an addiction medicine clinic located in Gate City, Virginia.

24.    Palin was listed as the sole owner of MEMC, but Webb was heavily involved in its operations, primarily seeking to obtain new patients.

25.    MEMC hired Dr. Curtiss and Aaron Miller, M.D., both on a part-time basis, to provide addiction medicine services to patients at MEMC.

26.    Dr. Miller began working for MEMC near the end of MEMC's operations and worked there for a short period of time.  Dr. Miller saw only four patients and worked a total of only 17.5 hours for MEMC.

27.    Like Dr. Wagner's patients, the patients of MEMC were required to submit to weekly urine drug tests.

28.    Palin and Webb decided that drug screens of MEMC patients would be tested by Bristol Labs.  Palin owned both MEMC and Bristol Labs.  Dr. Curtiss and Dr. Miller did not control where urine drug screens were sent for testing.

29.     All of the patients of MEMC were given a quick-cup test every week, regardless of whether the patients were insured or uninsured.

30.     Rather than sending patients to Bristol Labs, urine samples were collected and quick-cup tests were performed on site at MEMC.  The samples were then sent to Bristol Labs.

31.     Most of the uninsured patients' samples were simply kept at Bristol Labs and not subjected to further testing, while most of the insured patients' samples were subjected to further testing.  In general, an uninsured patient's urine sample was tested only once, via the quick-cup test, while an insured patient's sample was tested three times, first the quick-cup test, then the Bristol Labs analyzer, and finally confirmation testing at Forensic Labs.[4]

32.     Dr. Curtiss and Dr. Miller signed their names to blank Physician's Order forms and allowed Bristol Labs employees to complete the forms ordering the laboratory tests.  Palin and a Bristol Labs technician trained Bristol Labs employees on how to complete the pre-signed order forms.  By signing the blank order form, Dr. Miller assumed the clinic and Bristol Labs would follow their ordinary procedures for drug screening patients.

---

[4]     While the testimony was that nearly all of the insured patients' samples were sent to Forensic Labs for confirmation testing, the claims data introduced by the government contradicts that assertion.  (*See infra* ¶¶ 91-100.)

33.    If an uninsured patient disputed the results of the quick-cup test, the sample could be tested on the analyzer and then sent to Forensic Labs for confirmation testing.  On approximately five occasions, a sample from one of Dr. Wagner's uninsured patients was sent for confirmation testing because the patient disputed the results of the Bristol Labs analyzer test.   If the confirmation test results showed that the analyzer test had been wrong, Bristol Labs paid for the confirmation testing.  If the confirmation test results were the same as the Bristol Labs analyzer test, the uninsured patient was responsible for the cost of the confirmation test.  On approximately three occasions, Dr. Curtiss requested that a sample of an uninsured patient be sent for confirmation testing, either because the patient disputed the results of the quick-cup test or there was something unusual about the sample.

34.    There were a few insured patients who refused the analyzer test because they did not want to use their insurance, for fear of alerting their employer that they had a substance abuse problem.  Those patients elected to be tested with the quick-cup test only.

35.    The turnaround time for testing done at Bristol Labs was 24 hours. The turnaround time for testing done at Forensic Labs was 48 hours after shipment by Bristol Labs.

36.    Most patients of MEMC were seen weekly.  The results of the quick-cup test were available immediately for use by the doctor at the same appointment at which the urine sample was provided by the patient.  The results of the Bristol Labs and Forensic Labs tests were both available for use by the physician at the following week's appointment.

37.    Confirmation testing is fully accurate.  Analyzer testing is about 96-98% accurate.  Quick-cup testing is 90% or less accurate.

38.    Unlike the quick-cup test, the analyzer and confirmation tests are quantitative tests that reveal how much of a substance is present in the urine sample.

39.    Quick-cup tests can produce false negatives for Xanax, Fentanyl, and Klonopin.  A quick-cup test can produce a false positive if the patient has taken Robitussin, Nyquil, Paxil, or Clarinex, among other substances.

40.    A quick-cup test does not test for alcohol.  The analyzer does test for alcohol.  Alcohol and buprenorphine can interact dangerously.

41.    There are ways for people to cheat on a urine test, and the quick-cup test is the easiest test to cheat.

42.    If a patient had not been taking the prescribed Suboxone or Subutex regularly, but took it just the day before the urine test, the quick-cup test would indicate that the patient had taken the Suboxone or Subutex.  However, the

analyzer would show that the patient had taken only one dose of the Suboxone or Subutex, which would suggest that the patient might be diverting or selling the remainder of the prescribed medicine.

43.    A Bristol Labs employee was always present at MEMC to collect urine samples, perform quick-cup tests, collect money, and schedule appointments.

44.    MEMC did not accept insurance, but a Bristol Labs employee located at MEMC would collect patients' insurance information and give it to the laboratory technician at Bristol Labs.

45.    When MEMC first opened, the Bristol Labs laboratory technician stated in an email to a Forensic Labs employee that all of the MEMC patients whose samples would be sent for confirmation testing would have health insurance.    In other words, before MEMC began treating patients, Bristol Labs determined that it would not submit uninsured patients' urine samples for confirmation testing.

46.    Bristol Labs was required by law to have a laboratory director.    Carina Cartelli, M.D., was the laboratory director for Bristol Labs.    She lived in Vermont and was available by phone, but she only visited Bristol Labs about every six months.    Her primary job was to ensure that Bristol Labs was compliant with the requirements of the Clinical Laboratory Improvement Amendments ("CLIA"), the federal regulations that govern all clinical laboratory testing.    Dr. Cartelli was not

familiar with the day-to-day operations of the lab and did not know that Bristol Labs was performing quick-cup tests.

47.    A drug counselor named Sandra Morgan had worked with Dr. Wagner in his earlier practice in Johnson City, Tennessee.  Webb had visited that practice and told Morgan that he would pay her a per-patient referral fee if she could persuade the doctors in her practice to use Bristol Labs for analysis of urine drug tests.  She told him that she was not interested and he did not pay her anything, but he left a refrigerator at the practice.

48.    Bristol Labs performed advertising and marketing for Dr. Wagner's Bristol, Virginia, practice.

49.    On a TennCare prior authorization form, the fax number listed for Dr. Wagner was the Bristol Labs fax number.

50.    In an email to Dr. Wagner, Palin wrote, "I saw the first of your patients today~thank you!!" and stated that she was "very happy to start on our new adventure with you."  (Gov't Ex. 54.)

51.    Dr. Wagner initially ordered drug tests of his patients randomly, but about two months after opening his clinic in Bristol, he began ordering drug tests of all patients weekly.

52.    An email discovered pursuant to a search warrant, sent from the Bristol Labs email address to the same email address, and which appears to be a

list of tasks, states, "ask Charlie to first bring in new patients with insurance, then 2nd tier is those without." (Gov't Ex. 51.) Dr. Wagner's first name was Charles. I find that this email was likely written by Palin or Webb or at their direction.

53.    Dr. Wagner's patients were often given prescriptions without seeing the doctor.  After he moved to Louisiana, an office worker with no medical training or even a high school education was tasked with reviewing drug screen results and handing out prescriptions.  She sometimes gave prescriptions to people who had tested positive for a drug of abuse.

54.    In general, tests whose results are not used in treating a patient are medically unnecessary.

55.    Dr. Wagner's patient files reveal that he was not using the results of urine drug screen tests to direct his treatment of patients.

56.    Dr. Wagner's office had none of the usual medical office equipment, such as a stethoscope or blood pressure cuff.

57.    Bristol Labs employees were present at Dr. Wagner's office during times when Dr. Wagner was not there.

58.    Bristol Labs purchased and placed signs advertising MEMC.  The phone number on the signs was the number of a cell phone purchased by Bristol Labs.

59.    Webb and other Bristol Labs employees worked closely with Dr. Curtiss's husband to market MEMC and recruit new patients.

60.    Dr. Curtiss's paychecks were picked up at Bristol Labs, and the Bristol Labs bookkeeper issued the checks.

61.    Between January, 2011, when MEMC began operations, and November, 2011, when MEMC ceased operations, Bristol Labs paid approximately $22,000 into MEMC to ensure MEMC's financial viability.

62.    Uninsured patients of MEMC signed a form stating:

> Mtn. Empire Medical Care, LLC ("Mtn. Empire Medical Care Physician") orders automated laboratory toxicology testing for all of its patients.  Most insurances are accepted for the laboratory testing. If a patient does not have health insurance benefits which pay for these ancillary services, Mtn. Empire Medical Care Physician will order less sophisticated and therefore less expensive toxicology testing if the patient so requests.  By signing below, the patient indicates his/her request for the less expensive toxicology testing and that he/she is aware of the lower standard of medical care which they will be receiving by way of the non-automated testing and assent to same.

(Palin Ex. 4.)  The signing of these consent forms was not preceded by any doctor-patient discussion about the comparative benefits and drawbacks of the different kinds of tests.  I find that these forms do not represent the patients' informed consent and that the forms were used merely to give the appearance that the patient had knowingly requested quick-cup testing only.

63.    Insured patients were not given the option of having the quick-cup tests billed to their insurance provider.  I infer from this fact that the coconspirators did not want insurers to know that patients were routinely receiving both quick-cup and analyzer tests, as that knowledge may have alerted insurers that the analyzer tests were unnecessary.

64.    Dr. Miller did not see his patients weekly, but he still ordered weekly drug tests for all patients.  Dr. Miller did not personally decide which type of tests would be performed.  He does not know who made that decision.

65.    Palin asked Dr. Miller to start ordering weekly drug screens for all his patients.  Without her request, he would not have required weekly drug screens for every patient.  Typically, he would reduce the frequency of drug screens over time unless the patient tested positive for a banned substance, in which case the frequency might be increased.  Dr. Miller does not order weekly drug testing of all patients at his current practice in Illinois.  However, according to Dr. Miller, a number of similar clinics do drug test every patient weekly.

66.    Dr. Curtiss was aware that MEMC patients were required to submit to weekly drug tests, and she was aware that many samples were sent to Bristol Labs for more detailed analysis.  She did not know how much patients or insurers were charged for the testing.

67.    Dr. Curtiss believed that requiring all patients to submit to weekly drug screens was an important and medically necessary component of addiction treatment.  She further believed that weekly quantitative testing on the analyzer was appropriate because it provided more thorough and accurate results than the quick-cup test, and a patient's willingness to have his or her sample tested on the analyzer showed a greater commitment to staying sober and complying with the treatment plan.  She believed that the confirmation tests done by Forensic Labs were appropriate because they provided even greater accuracy.

68.    Dr. Curtiss believed that all patients were offered quantitative testing and that some patients chose to opt out of those tests, possibly due to a lower level of commitment to the treatment program.  She was not aware that the patients' insurance status was the primary determinant of which patients received which kind of test.

69.    Palin, Webb, and their agents, rather than Dr. Curtiss, determined which patients would receive the more expensive analyzer and confirmation tests, and that decision was in almost all cases based solely on the patient's insurance status.

70.    On July 26, 2011, Palin and Webb emailed Dr. Curtiss, through Dr. Curtiss's husband's email address, "urging Mary to start ordering toxicology labs on all patients 2/x a week."  (Gov't Ex. 167 at 3.)  "Exceptions would only be a

really long-term patient~I think we may have (1) person in this category." (*Id.*)
Later in the same email, Palin and Webb wrote, "I would prefer to wait to order
chem labs on our patients until we can do it in our lab." (*Id.*)  That email was
followed by one from Bristol Labs to the Curtisses emphasizing the need for
"fiscal responsibility" and "positive cash flow." (*Id.*)

71.    When no second drug screens were ordered immediately, Bristol Labs
again emailed Dr. Curtiss and her husband to "be super-clear with Mary about the
second drug screen for each patient, each week." (*Id*. at 1.)  The email stated, "I
suppose it will work out better if Dr. Mary tells them it['] s necessary and then our
staff can follow up with an Order, directions to the lab, etc." (*Id.* at 2.)

72.    Dr. Curtiss's husband replied, "Mary is in agreement that two drug
screens per week are a good idea, and should be part of the program with the
emphasis on people resisting temptation in their initial stage of treatment." (*Id.* at
1.)  He later noted the burden this might place on patients who live far from Bristol
Labs, however, suggesting that "[p]erhaps a short term solution might be for
patients more than a certain distance from Bristol or Gate City to get a screen from
a local lab." (*Id.*)

73.    Despite this exchange, the twice-weekly testing policy was not
implemented.

74.     When a patient could only come to MEMC or Bristol Labs after hours, a Bristol Labs employee would verify that the patient met all the criteria on a checklist that Dr. Curtiss had developed, including a satisfactory urine drug screen.  The Bristol Labs employee would then give the patient a prescription for Suboxone, signed in advance by Dr. Curtiss.

75.     One of the Bristol Labs employees who collected urine samples at MEMC was an addiction recovery patient of Dr. Curtiss and received Suboxone prescriptions from her the entire time he worked there.

76.     One of Dr. Curtiss's patients asked to reduce the frequency of her MEMC visits to every two weeks.  Dr. Curtiss eventually allowed her to do this, but MEMC required the patient to pay $200 per visit rather than the usual $100 per visit.  In other words, she was essentially required to pay for doctor's visits she did not attend.

77.     Dr. Curtiss was not involved in billing for services on behalf of either MEMC or Bristol Labs.

78.     Based on the testimony of the government's expert witness, Samuel Hughes Melton, M.D., I find that the standard of care in addiction medicine requires urine drug screens to be ordered at a frequency that is determined by the need to monitor the individual patient for compliance.  Frequent testing by quick-cup meets the standard of care.  Further automated testing of urine drug screens is

warranted when the doctor is randomly spot-checking samples to ensure accuracy of the quick-cup tests, or when the results of the quick-cup are questioned in some way, either by the patient or by the doctor based on the patient's behavior or history. But it is not medically necessary to send every single sample for quantitative or confirmatory testing.

79.    In his own addiction medicine practice, Dr. Melton requires every patient to take a quick-cup test at every visit. Initially, he sees his patients three times a week; the frequency eventually drops to twice a week, then weekly, then every other week, assuming the patient remains compliant with the rules and progresses favorably in treatment.

80.    Dr. Melton estimated that approximately 40% of his patients' quick-cup samples are sent for further quantitative testing.

81.    Based on the testimony of healthcare consultant Mark Lowe, who assisted in contract negotiations between Palin and Dr. Curtiss, and his experience working with approximately ten other addiction medicine clinics, I find that a physician prescribing Suboxone and Subutex can earn from $1,000 to $3,000 per day.

82.    Dr. Curtiss was paid $1,400 per day she worked at MEMC. If Dr. Curtiss worked an eight-hour workday, her pay rate was the equivalent of $175 per hour. Dr. Miller was compensated at a rate of $175 per hour.

83.    Dr. Curtiss's salary of $1,400 per day represents the fair market value of the medical services she provided.

84.    In an email to Palin dated August 9, 2011, an accountant doing work for Bristol Labs informed Palin that MEMC had experienced a large financial loss in July of that year.  In response, Palin wrote, "no kidding!  thanks!  can't wait to see the statement for the lab! Thanks!"  (Gov't Ex. 266.)

85.    While it is not unusual for a business to lose money in its first year of operation, I find that the establishment and operation of MEMC had as its primary purpose the production of revenue for Bristol Labs.

86.    For patients of both Dr. Wagner and MEMC, the primary factor that determined whether a patient's urine drug screen was tested on the analyzer and sent for confirmation testing was whether the patient had insurance.  The primary factor was not the patient's progress in treatment, or whether anything about the quick-cup test or the patient's condition indicated a need for further analysis of the sample.  The driving force behind Palin and Webb's insistence that every insured patient receive weekly quantitative testing was a desire to generate revenue for Bristol Labs.

87.    In a recorded telephone conversation between Palin and Webb, which took place while Webb was in custody pending trial, Palin expressly stated that she

had refused to test the samples of uninsured patients on the analyzer because she knew she would not receive payment for those tests.

88.    Although Webb was not technically an owner of MEMC or Bristol Labs, he was involved in the management of both businesses and directly benefited from the profits generated by Bristol Labs.

89.    Bristol Labs billed third-party payors $1,875 for each analyzer test. Medicare would only pay $117 per analyzer test, and Medicaid would only pay $121, although non-governmental health insurers paid more.

90.    Bristol Labs did not regularly charge patients the co-pay and co-insurance amounts that were required by the patients' insurance policies.  I find that they decided not to bill patients these required amounts so that the patients would not question the need for the expensive testing.

91.    Between February, 2009, and April, 2012,[5] Bristol Labs billed various health care benefit programs, including Medicare, Virginia Medicaid, TennCare, and non-governmental health insurers, $12,474,147 for analyzer tests for patients of Dr. Wagner, Dr. Curtiss, and Dr. Miller.  The various health care benefit programs paid Bristol Labs a total of $1,142,942 for those claims.

92.    During the same time period, Forensic Labs billed various health care benefit programs $1,804,193 for confirmation tests for patients of Dr. Wagner, Dr.

---

[5] This time period is several months longer than the period of time charged in the Indictment.

-23-

Curtiss, and Dr. Miller.  The various health care benefit programs paid Forensic Labs a total of $293,945 for those claims.

93.    During the relevant time period, Bristol Labs submitted 2,563 individual claims to Medicare for patients of Dr. Wagner and 846 claims to Medicare for patients of Dr. Curtiss.  Forensic Labs submitted 948 claims to Medicare for patients of Dr. Wagner and 196 claims to Medicare for patients of Dr. Curtiss.

94.    During the relevant time period, Bristol Labs submitted 920 claims to Blue Cross Blue Shield of Tennessee for patients of Dr. Wagner and 84 claims to Blue Cross Blue Shield of Tennessee for patients of Dr. Curtiss.  Forensic Labs submitted two claims to Blue Cross Blue Shield of Tennessee for patients of Dr. Wagner.  In addition to providing private insurance, Blue Cross Blue Shield of Tennessee also manages portions of the TennCare governmental insurance program, and many of these claims were for patients insured through TennCare.

95.    During the relevant time period, Bristol Labs submitted 5,056 claims to UHC Optum Commercial for patients of Dr. Wagner.  Forensic Labs submitted 2,863 claims to UHC Optum Commercial for patients of Dr. Wagner.

96.    During the relevant time period, Bristol Labs submitted 8,963 claims to TennCare MCO UHC Optum for patients of Dr. Wagner and 561 claims to TennCare MCO UHC Optum for patients of Dr. Curtiss.  Forensic Labs submitted

3,087 claims to TennCare MCO UHC Optum for patients of Dr. Wagner and seven claims to TennCare MCO UHC Optum for patients of Dr. Curtiss.

97.    During the relevant time period, Bristol Labs submitted 1,303 claims to Anthem Blue Cross Blue Shield of Virginia, for patients of Dr. Wagner and 909 claims to Anthem Blue Cross Blue Shield of Virginia for patients of Dr. Curtiss.

98.    During the relevant time period, Bristol Labs submitted 12 claims to Aetna Insurance for patients of Dr. Wagner and 16 claims to Aetna Insurance for patients of Dr. Curtiss.  Forensic Labs submitted eight claims to Aetna Insurance for patients of Dr. Wagner and seven claims to Aetna Insurance for patients of Dr. Curtiss.

99.    During the relevant time period, Bristol Labs submitted 227 claims to Cigna Insurance for patients of Dr. Wagner, and Forensic Labs submitted 216 claims to Cigna Insurance for patients of Dr. Wagner.

100.   During the relevant time period, Bristol Labs submitted to Virginia Medicaid 12,386 claims for patients of Dr. Wagner, 2,784 claims for patients of Dr. Curtiss, and six claims for patients of Dr. Miller.  Forensic Labs submitted to Virginia Medicaid 9,802 claims for patients of Dr. Wagner and 910 claims for patients of Dr. Curtiss.

101.   The above-referenced health care benefit programs have rules prohibiting providers from submitting claims for medically unnecessary services.

102.  Palin, Webb, and Dr. Wagner knowingly joined in a conspiracy to defraud health care benefit programs by devising and executing a scheme to bill these programs for tests that were not medically necessary.

103.  Dr. Curtiss did not join in the conspiracy.  Although Dr. Curtiss failed to more properly supervise the testing process, she did not knowingly and willfully execute the scheme to defraud the health care benefit programs.

104.  Dr. Curtiss's salary was not contingent on the volume of urine drug screens she ordered.

105.  Dr. Curtiss's salary was compensation for services she rendered in good faith.  Dr. Curtiss did not accept her salary in exchange for referring urine drug screens to Bristol Labs.  The payment and receipt of Dr. Curtiss' salary was not a kickback for referral of drug testing to Bristol Labs.

### III.  ANALYSIS.

In order for me to find any of the defendants guilty of any of the crimes charged, I must be convinced beyond a reasonable doubt that the defendant committed the specific crime as charged.  If the government has not proven beyond a reasonable doubt that the defendant committed the crime as charged, I must find him or her not guilty of that crime.

A.

The criminal health care fraud statute provides, in relevant part:

> (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a). To obtain a conviction for health care fraud, the government must prove that a defendant:

> (1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud.

*United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008) (citation omitted).

The Fourth Circuit has explained that "[t]he health care fraud statute is not a medical malpractice statute, it is a simple fraud statute." *United States v. McLean*, 715 F.3d 129, 136 (4th Cir. 2013). A defendant cannot be convicted of violating the statute unless the government proves beyond a reasonable doubt that the defendant acted "knowingly and willfully" to defraud insurers. 18 U.S.C. § 1347(a); *McLean*, 715 F.3d at 137. In a case like this one, where the government

contends that the defendants ordered and billed for medically unnecessary tests, the government must prove that the defendants knew the tests were unnecessary. *See Id*. "[T]he specific intent to defraud may be inferred from the totality of the circumstances and need not be proven by direct evidence." *Id.* at 138 (quoting *United States v. Harvey*, 532 F.3d 326, 334 (4th Cir. 2008)).

The statute regarding conspiracy to commit health care fraud states, "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. The elements of conspiracy to commit health care fraud are: "(1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose." *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir.), *cert. denied,* 134 S. Ct. 2318 (2014) and *cert. denied sub nom. Shafer v. United States*, 134 S. Ct. 2320 (2014) (stating elements of conspiracy under 18 U.S.C. § 1349 as applicable in mail and wire fraud case) (cited favorably in *United States v. Lewis*, 612 F. App'x 172, 175 (4th Cir. 2015) (unpublished), as providing elements of conspiracy to commit health care fraud). Circumstantial evidence of participation in a common plan is sufficient proof of an agreement. *Hunt*, 521 F.3d at 647.

I find that Palin and Webb, along with Dr. Wagner, knowingly and willfully executed a scheme to defraud health care benefit programs by submitting bills for tests that they knew were not medically necessary. They devised the drug testing plan and they directed their non-medically-trained staff to order expensive analyzer tests for every insured patient, knowing that the insurers would pay Bristol Labs for the tests. The coconspirators decided that uninsured patients would be tested by the quick-cup only, while insured patients would receive the quantitative testing by Bristol Labs and Forensic Labs. Their influence went beyond mere marketing; they made the decisions regarding testing, and they knew that these decisions were not based on the needs of the individual patients. They also knew that they were not regularly charging patients the required co-pays and co-insurance amounts, in order to hide from the patients the costs of the testing.

It was argued at trial that Palin, Webb, and Bristol Labs were simply following the doctors' orders for the analyzer and confirmation tests, but the evidence does not support that assertion. Rather, it is clear that the coconspirators determined which tests would be performed, and those determinations were made without regard to whether the tests were medically relevant.

It was also argued that it did not constitute fraud for the defendants to treat insured and uninsured patients differently. It was contended that a medical provider is not normally required to provide free services, and because uninsured

patients were unlikely to be able to pay for the expensive analyzer test, the defendants were justified in limiting those patients to the inexpensive quick-cup urine testing.   I find, however, that the fraud here consisted of requiring the expensive tests only because they would be paid for by insurance, rather than because they were medically indicated.   The government has shown beyond a reasonable doubt that, with rare exceptions, insured patients were automatically tested by the analyzer.   While not subjecting uninsured patients to the expensive tests may not be fraudulent by itself, it is further evidence of the real purpose of the scheme.   As with insured patients, the type of test performed on uninsured patients was not based on the patient's treatment needs.

On Webb's behalf, it was argued that he was only an employee of Bristol Labs, with limited duties, and that the evidence does not show that he devised or participated in the scheme to defraud.   However, while there is no doubt that Palin and Wagner were more heavily involved in the conspiracy, a defendant "need not . . . comprehend the reach of the conspiracy [or] participate in all the enterprises of the conspiracy" in order to be found guilty.   *United States v. Burgos*, 94 F.3d 849, 861 (4th Cir. 1996).   Indeed, participation by a coconspirator on only one occasion may be sufficient to show guilt.   *Id.* at 858.   The government has proved beyond a reasonable doubt that Webb joined the conspiracy understanding its nature, even though he may have played only a minor role.   Moreover, as to the substantive

charge of health care fraud, a conspirator may be convicted of an offense committed by a coconspirator if the crime was committed during the course of and in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946). At the least, Webb is guilty of Count One under the *Pinkerton* doctrine based upon the commission of this offense by Palin and Wagner during the course of and in furtherance of the conspiracy.

Based on these facts, I find that Palin and Webb are guilty of committing health care fraud and conspiracy to commit health care fraud as charged in the Indictment.

## B.

The Anti-Kickback Statute prohibits both the offering and acceptance of illegal remunerations in exchange for referrals. Regarding the acceptance of kickbacks, the statute states:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . .
>
> . . .

shall be guilty of a felony and upon conviction thereof, shall be fined
not more than $25,000 or imprisoned for not more than five years, or
both.

42 U.S.C. § 1320a-7b(b)(1)(A).  Regarding the offering of kickbacks, the statute

provides:

> (2) whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or in kind to any person to
> induce such person—

>> (A) to refer an individual to a person for the furnishing or
>> arranging for the furnishing of any item or service for which
>> payment may be made in whole or in part under a Federal
>> health care program, . . .

>> . . .

> shall be guilty of a felony and upon conviction thereof, shall be fined
> not more than $25,000 or imprisoned for not more than five years, or
> both.

42 U.S.C. § 1320a-7b(b)(2)(A).

"This statute criminalizes the payment of any funds or benefits designed to

encourage an individual to refer another party to a Medicare provider for services

to be paid for by the Medicare program."  *United States v. Miles*, 360 F.3d 472,

479 (5th Cir. 2004).  For a defendant to be convicted of offering or paying

kickbacks, the government must prove that the defendant: "(1) knowingly and

willfully made a payment or offer of payment, (2) as an inducement to the payee,

(3) to refer an individual, (4) to another for the furnishing of an item or service that

could be paid for by a federal health care program." *Id.* at 479-80. The payment element "includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended." *United States v. Greber*, 760 F.2d 68, 71 (3rd Cir. 1985). The words "to induce" require "an intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program-related business." *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995). "Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient." *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989). The fact that the payment is consistent with the fair market value of the services rendered does not necessarily render the payment lawful. *See id.* at 31. "The language of the statute makes no distinction on the basis of control or extent of participation." *Id.* at 35.

While I find that Palin and Webb established MEMC with the intent that it would generate business for Bristol Labs, I conclude that Dr. Curtiss was employed to provide legitimate medical services and that she was paid a fair market salary for providing those services. Her job was not contingent upon referring a certain number of tests, nor did her salary fluctuate based on the number of tests she ordered. Dr. Curtiss did not believe she would lose her job if she did not refer as many tests as possible to Bristol Labs. Based on the evidence

presented and the legal precedent under the Anti-Kickback Statute, I find that the government did not prove beyond a reasonable doubt the crimes charged in Counts Three and Four of the Indictment.

## IV.    CONCLUSION.

Based upon my factual findings and the applicable law, I find defendants Palin and Webb guilty of Counts One and Two of the Indictment, but not guilty of Count Four.  I find defendant Curtiss not guilty of all charges.

DATED:   April 7, 2016

/s/  James P. Jones
United States District Judge